Thank you, Your Honors. May it please the Court, my name is Andrew Lindeman. I represent what we've been calling the DSS appellants. Those are the appellants Kim Idlett, Meredith Williams, Candace Davis, and Mary Searcy. And that's to contrast the three medical doctors who are also defendants in the underlying case and appellants in this case who are represented by other counsel you'll be hearing from. Your Honors, in summary fashion, this case will examine whether there was clearly established law in 2006 that provided fair notice not only to my clients, the DSS appellants, but also the medical doctors involved in this case that sex assignment surgery for an intersex child, a 16-month-old infant who was born with ambiguous genitalia, whether or not that violated that child's substantive and procedural due process rights. That's what this case is in essence. It is a qualified immunity case that's before Your Honors on an interlocutory appeal from Judge Norton in the District Court of South Carolina. We contend that Judge Norton, in denying our Rule 12b-6 motion to dismiss based upon qualified immunity, that he made two principal errors. Number one, he failed to identify and address the constitutional right given the specific context of this case and in what this Court and the United States Supreme Court require, which is a high degree of particularity. In addition to that, he failed to recognize and address the absolute lack of any controlling authority from the United States Supreme Court or from this Court that addresses the issues involved in this particular case. The governing principles of the law, as I know Your Honors are well acquainted with qualified immunity, have written on it numerous times. I do want to touch on a couple of points because I think the United States Supreme Court in some of its most recent qualified immunity cases has really focused on the principles that are applicable here. In the Ashcroft v. Elkid case from 2011, in fact, the Supreme Court admonished the Ninth Circuit, apparently it indicated that it had problems with the Ninth Circuit in particular with this, for doing exactly what we believe the District Court in this case, and that is look at the constitutional right only in a very general sense. The Court indicated that they have repeatedly told courts not to define clearly established law at a high degree of generality. And in fact, what is required is a high degree of particularity. Using that particular example of the Elkid case, the Ninth Circuit had looked at Fourth Amendment law and had decided that unreasonable searches and seizures were clearly established. But we have the same problem in this particular case, even though we're- Excuse me, your contention, it's hard to get a question. I tried to wait for a pause, but there wasn't one. Please interrupt me. Your contention here is that there was consent to this procedure, and the child was in the custody of the state, and the state consented to the procedure, correct? Well, that's the way it's been pledged, Your Honor. And obviously it's a 12B6 motion, so we're bound by the allegations of the complaint. You're not disputing now? Well, there is a dispute as to who consented. So you say you didn't consent? The actual, and I don't want to go outside the record because I'm bound by the pleadings for purposes of this motion, but what the evidence will show, we believe, is that the mother, the biological mother who still had rights over this case is the one who consented. Okay, I think someone else consented too, but there's no argument that the state didn't consent, right? The state had the child in its custody, was with a foster parent, and the state did allow for the surgery to take place. Authorized might be the better term, but yes. I would think that you would sort of latch on to consent. You would say that this is okay because of the consent, but no, you don't want to say that. Well, what I'm saying is the actual consent, but again, that's the way it was pledged. It was pledged, so you're exactly correct, it was pledged that the DSS director consented to the surgery itself. Okay, so let's take it since that, we must do on motion dismiss the way it's pledged, so let's take it that we did that. Absolutely. All right. Is there any limiting principle? Is there anything that the state, as the guardian for this child, could not consent to that would not be entitled to qualified immunity? Not that I'm aware of. Certainly, no type of medical procedure. Now, there is some suggestion from the PARM versus JR case that you couldn't just institutionalize a child without there being some sort of due process. But in this particular case, what we're dealing with is a surgical procedure. We're not dealing with any type of involuntary confinement. So the state could consent to involuntary sterilization? Well, the state could not do that based upon the fact that there's no longer involuntary sterilization statutes in place in the state of South Carolina. Yeah, but that's not, that wasn't the question. What I was asking you for was a limiting principle. Could the state consent to any medical procedure? And involuntary sterilization is certainly one. Well, certainly. And I mean, there is no statutory authority for allowing for that in this particular case. And that was, that used to be the law in South Carolina, as it was in numerous states, and of course, it's been reviewed. There's a statutory authority specifically allowing for this procedure? Well, not specifically for this procedure. Well, then I don't understand what the distinction is. But yes, there is law that allows for the state, when they have a child in custody, in order to provide medical care and authorize surgery. And in addition, there's a family court order that, once the child was taken into custody, provided that authority to the state. But could the state, under that authority, involuntarily sterilize the child? I would suggest probably not. I mean, that's obviously not the issue. They wouldn't have qualified immunity for that? I would think probably they do not. Why? Well, because in the, well, first of all, that's, we contend that's completely separate from this particular case. I understand. And you don't even have to answer that question if you can tell me the limiting principle. Well, the limiting principle would be the repeal of the statutory authority for doing that. But there is statutory authority. General statutory authority is what you're relying on. So is there anything that you, the state generally has authority to look after these children? That's what the custody gives them. But is there anything that they, any procedure that they could subject the child to or consent to have the child undergo that would not be entitled to qualified immunity? And yes, you can answer the question. Again, I don't believe that to be the case. I mean, here we're dealing with sex assignment surgery. But you've already told us there's one case, involuntary sterilization, that they couldn't, couldn't be entitled to qualified immunity. Well, and the only reason why I'm citing that, I mean, there's no clearly established law on that either. But the fact, what I'm relying on there is the state had statutes that were in place that were then repealed. And so that would suggest to me that you probably have some, some issues arguing qualified immunity on that. So, electroshock therapy? Electroshock therapy, that probably would be, would be permitted, particularly if I was, as it was in this particular case, it was recommended by physicians. Well, what if sterilization were recommended by a physician? Well, I suppose if it was recommended by a physician, it probably could be. You're probably making a valid point on that. I don't know if I am or not. I'm trying to identify a limiting principle here. Don't you see how that undercuts your argument? If we should conclude that, no, that's not right, then where is the limiting principle in your argument? Well, I think, of course, and I see my time is up and because we're splitting this time, but I think that's what you're focused on, exactly what the problem is in this particular case. The contours of the right have not been clearly established. We're essentially guessing this is in, these are gray areas of the law. Well, I don't, your time has expired, you're right, you can be thinking about a limiting principle here. All right. Thank you. May it please the Court. I'm Ben Alexander. I'm here on behalf of Dr. James Amron. We are asking the Court today to overturn Judge Norton's order, at least as it applies to Dr. Amron, and to dismiss this action against him on the basis of our claims of qualified immunity in this case. And in support of that argument, we would make four points. Point number one is that Dr. Amron did not perform the surgery that is at issue in this case and is alleged to have caused the constitutional deprivation. And the retention of discretion of an independent decision maker to perform or not perform a surgery severs the causal link between Dr. Amron's alleged participation on a treatment team and the constitutional deprivation that's being alleged in this case. Point number two is even if there is a proximate causal link between Dr. Amron's participation on this treatment team and the constitutional deprivation that occurred, Dr. Amron's specific conduct on that team is alleged in plainest complaint that he examined the child, he diagnosed the child, he referred the child to additional medical providers, to an additional medical university, to additional medical doctors, does not meet the Court standard under a Fourteenth Amendment analysis of conduct that would shock the conscience of the Court, nor is it a substantial departure from professional judgment. So that doesn't sound like qualified immunity to me. That sounds like, I mean, like a more classic 12B6 kind of motion. Well, I think under qualified immunity, we've got to find that there was a clearly established constitutional right, and that it was violated. I would argue that it was not clearly established, nor was it violated in this case, at least as it applies to Dr. Amron. But if the allegation is that, you know, hypothetically, six physicians unanimously recommended this, and then a seventh physician performed the surgery, you don't think that would survive a 12B6 motion on just sort of traditional tort principles? I think under the principles that were set out in the Evans v. Chalmers case, that was the Duke-LaCrosse case, where you had essentially the same argument. That is that the officers in that case were acting in concert and conspiracy with the prosecutor to bring an indictment against those folks, which formed the basis of a malicious prosecution deprivation of constitutional rights. That was the issue. That was the argument in that case. And this court said, no, that's not sufficient. That is the nature of law enforcement. Police officers work in concert with prosecutors. But prosecutors have independent discretionary judgment as to whether they bring charges or they do not. And that independent judgment severs the causative link between the actions of a police officer and the deprivation of constitutional rights. And the court said, because we have to do that almost, because then you would strip them of this qualified immunity argument in almost all cases, because there's almost always going to be evidence that they have collaborated with or communicated with prosecution. I would argue the same is true in medical. Mr. Alexander, I'm sorry. I don't mean to interrupt you either, but you've got to stay in front of the podium because it picks up the sound for the reporter. I understand. And it shows how comfortable you are in the court and what a great trial lawyer, but here you guys stood there. I understand. Thank you. Thank you. And you also slowed me down. I'm sorry. In any event, the principle behind the finding, I believe, in Evans v. Chalmers is very similar to the one here. I think the court was unsettled by this notion that this is the way law enforcement works. They communicate with one another. And to always drop them in the same bucket causes great practical problems. And so you decided to sever that causal link with a limiting factor of saying, unless the intimidated, lied to, or deceived the prosecutor, and failing any allegations of that sort, you severed that causal link. But this is different. You've got three doctors collaborating to recommend a specific procedure according to the complaint. Doesn't that make this different than that analogy? No, I actually think it makes it exactly the same because that's the nature of medical care. Medical doctors like Dr. Amron, who is not a surgeon but a medical doctor, make diagnosis, they make recommendations, and they refer patients to other doctors. I would argue that unless, but those doctors retain the independent discretion to either perform surgery or not perform surgery based on their own expertise. I would argue that unless they were pressured to do that surgery, intimidated into doing that surgery, or lied to and that formed the basis of that surgery, there should be a severing of that causal link. Otherwise, treating physicians will always be dumped in this bucket based on the independent discretionary decisions made by someone else down the chain. I actually think it's a, you know, the Evans versus Chalmers case and the way you handled that gives us, you know, gives the person who's been alleged to be deprived of a constitutional right an opportunity to redress that. Can you finish up? Yes, ma'am. Sorry. But it eliminates the possibility that we've cast the due process net not only too far but also too wide by severing that causal link with treating physicians down the line. Thank you. May it please the Court. Your Honors, I'm Ellery Gaines, and I represent the MUSC physicians, Dr. Ian Aaronson and Dr. Yaa Abidjiadonka. I will refer to them as the MUSC physicians. Your Honors, the issue in this case is qualified immunity. It is old, old established law, well-established law that in order for our clients, in order for the MUSC doctors or any of the defendants I would submit to be liable under Section 1983 constitutional liability to the appellees, there has to be a finding of a clearly established right owed to the 16-month-old infant where our clients transgressed a bright line. That is simply not here in this case. It is a 12B6 motion. We have to take all of the facts as they are pled, and they have pled consent. They have established. They have pled consent, and so is it your position that if there is consent the state can do anything? I do think, Your Honor, that the state would have to satisfy procedural due process, and I think they did it in this case. So I think that takes us a little bit outside of the argument for the MUSC doctors. They did have consent. There is absolutely nothing that would have put the MUSC doctors on notice that they would have been violating the constitutional rights of this infant by providing the therapeutic But is it your position that they can do anything if they give somebody a quote hearing? In other words, they put their expert on. Their expert says this child should be sterilized. That DSS could? I beg your pardon? That the DSS defendants could consent? You know, feeble-minded I am. I'm limiting you altogether, and if you don't want to be, if you want to disavow that position, that's fine, and I understand your colleague was making arguments just with respect to his person. That is fine, but that's sort of my core question, and you heard me ask your colleague, and I'd love to get a response. Absolutely. Your Honor, I think that the answer to that question with respect to qualified immunity lies then. If they did not have an unlimited capacity to consent, there is no clearly established law putting them on notice that by giving an unlimited consent, I'm not conceding that they did give an unlimited consent here, because what happened here is that they acted with their consent, with the collaboration of the physicians, the complaint clearly pleads that they met, they discussed it, they met, they discussed it, they got the consent, they got the telephone consent before they did the procedure. We have read the complaint, and you don't have very much time, but they pled the consent, they got the consent. What I'm asking you is, does this consent then give the defendants the right to do anything they want with respect to this trial? I don't think that it gives them the right to do anything they want, but I think that it gives them the right to do what was done in this case. I understand that, and what is the difference? What limits them? What can't they do? What they couldn't do would be something that is already clearly established, like the Avery case, or like the forced sterilization cases. If there was a case that clearly established the specific parameters of what they were doing, and gave them fair notice under Pearson v. Callahan, that by doing that, whatever it would be, hypothetically, that they were consenting to, that they would be violating the plaintiff's constitutional rights. How about the right to be free from medically unnecessary surgery? Isn't that enough? Your Honor, I think that that question is answered in this sense, because there is a consent by the state as to the MUSC physicians. The MUSC physicians, there is no clearly established law that provided a duty that put them on notice of any duty they had to either confirm or initiate a pre-deprivation hearing. An infant's substantive due process rights, in this case, were exercised by the consenting party. This infant was provided due process because the rights were exercised by the consenting party. Well, the same could be said if the child were forcibly sterilized. You could have all the process in the world, but that would still be a violation of the child's rights. It may be, Your Honor, and I see that my time has expired, if I may respond. I'm sorry. Thank you. It may be, Your Honor, but I think under Ashcroft v. Al-Kid and the other qualified immunity cases, we would have to point, we would have to find a case, there would have to be a case that put them on notice that the particular conduct that they were engaging in would violate the plaintiff's constitutional rights. And in the cases that exist, it is never discussed what, qualified immunity isn't discussed, and the actions of the physicians who were actually providing those procedures, those therapies, are never discussed in a manner that would have put our clients on notice, the MUSC physicians on notice, that what they were doing violated the plaintiff's constitutional rights. Thank you. You have a little time for rebuttal. Thank you. Good morning. May it please the Court, my name is Christy Gronke, and I'm one of the attorneys who's representing the plaintiff, Apolli MC, in this matter. I want to go straight to the points about particularity and fair notice that I think all the defendants' counsel have raised. Defendants are essentially arguing that because MC's genitalia and reproductive structures were atypical, that his rights were not established with the particularity required to overcome their qualified immunity defenses. But under existing precedent, it is well established that, and it was well established at the time that the sex assignment surgery was performed, that individuals, including minors, have a fundamental right to make decisions related to reproduction. The contours of that right are clear and were clearly applied to MC. As early as 1972 in Eisenstadt v. Baird, the Supreme Court articulated the right to reproduction in very plain terms as the right of the individual to, quote, be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. And although the facts of Eisenstadt involved the rights of unmarried persons to obtain contraceptive devices, this bear or beget language has been repeated in numerous subsequent cases and in different factual contexts. When do you maintain that it was clearly established that this procedure was not appropriate, let alone not constitutional? I'm sorry, when you say not appropriate, not constitutionally appropriate? All right, either one. Inappropriate. I mean, as I read the literature, for some period of time, it was regarded as appropriate. No one suggested it was unconstitutional either. So when did that change? Well, the standard of care is something that is in factual dispute here. I would say that with respect to the standard of care, we allege facts in our complaint that suggest that defendants were not acting within the standard of care. I understand that. Do you understand my question? Perhaps I don't, Your Honor. Okay. Twenty years ago, would you have been able to make this argument? I believe so, Your Honor. Okay, 30 years ago. Yes, Your Honor, I think so. Okay, so did you think that 30 years ago, that it was established that this procedure was unconstitutional and contrary to the standard of care by definition, if unconstitutional, right? Correct. And I would say- And what authority says that? With respect to, I've talked about Eisenstadt v. Baird carrying forward. I think Casey really emphasized that language in Eisenstadt v. Baird quite clearly in 1992. That's not 30 years ago. I apologize. My math may be off. I'm sorry, Your Honor, but let me use years because I think that will be easier, and I apologize. Okay, so tell me when it became established. Well, I would argue as early potentially as 1972 in Eisenstadt v. Baird, but certainly Casey, to the extent that Casey discussed these rights more fully, Casey could be said to have done that in 1992. With respect to the bodily integrity claim here, Winston is, I think, a key case, and that was decided, I believe, in 1985. I'd also like to point out the Lawrence decision, 2003, and that decision really amplifies the egregiousness of the violation of bodily integrity in this case because the surgery here at issue was not merely, it was, first of all, medically unnecessary, but it was one of the most extreme private surgeries one can imagine in terms of what it accomplished. So am I to take it from your argument that you don't acknowledge, because I just think you do if you read any literature, that this is an area of the law that has been in flux, that the question ethically, morally, medically has been in flux? Your Honor, with respect to the law, we would have to admit that there are no factually specific cases that deal with this issue, yes. But in the medical literature, you know, the hospitals all have ethics departments, ethics, and then colleges and universities do, too, about medical ethics and what you can and can't do to patients. And you wouldn't concede that this is an area of law that has not been clear. Maybe now, but it has not been. It's true that there are disputed standards of care at issue with respect to sex assignment surgery, but the core issue here is the destruction of fertility. Well, as I understand it, you may have maybe helped me with the record, I didn't think that you alleged that this procedure resulted in infertility necessarily, but it made fertility, the ability to procreate less, more difficult, impossible. It wasn't necessarily a case before, but it was impossible after. Is that? We do not necessarily allege that as impossible. However, we allege that part of it is the difficulty of predicting the fertility of a prepubescent child, understandably. However, we allege that it made it significantly less likely because it destroyed all male fertility. And moreover, MC had the right to decide if he did have, as it happens, both female and male potential for fertility, to decide which to exercise, having been born with both. Why are there no supplemental state law claims here? Well, Your Honor, we have brought a parallel suit in state court in which we assert state law claims. Really? Yes. Against the exact same defendant? Correct. Pretty much. Yes. Why two suits? Um... If you'd rather not answer... Well, without sort of getting into the nitty-gritty of internal strategy, obviously there are different... So the state suit, just to give Your Honor, to attempt to answer Your Honor's question, the state suit alleges that the doctors failed to provide or failed to obtain informed consent for the procedure, and alleges that DSS engaged in gross negligence by authorizing the procedure. Okay. That's what I would have expected, but I would have expected to see it, see those claims brought as supplemental claims. That's fine. Go ahead. I don't want to slow you down. Certainly. As I understand your argument, this is a fact-specific claim. You're not suggesting that every time a parent or a guardian, in this case, elects this kind of surgery that they're liable as a matter of law under 1983? No. No, that's not what we're suggesting. And the facts here are... Why is this case different than other cases where this surgery is elected? Well... Or the doctors recommend it? In the case of private actors, obviously there would be no 1983 claim. Okay, let's put them the same, and the actors are both all public actors. Parents, you're saying, elected this for a child, but the doctors are... Whoever had custody of the child consented. Well, and we argue this in our brief, that there are some limits on what even parents can do. So are you going to retract your answer to my friend's question? Well, I'm sorry. Perhaps I didn't answer the question with appropriate precision. I think what we are talking about here is that there are some limits to in loco parentis, or parental consent, with respect to procedures that involve destruction of fertility. So a parent couldn't consent to this. Is that what you're saying? To the extent that destruction of fertility was threatened, a parent could not if state actors were involved in a constitutional sense. Now, if the conduct were wholly private, there wouldn't... No, no, no. We'll leave the part wholly private. Sure. If there's state actors involved, parents aren't state actors. That's right. But the parents consent. Sure. And the state actors proceed with the surgery. And you are saying that the state actors would then be violating the child's constitutional rights and liable under 1983? They could indeed. And in fact, Your Honor, we cite some cases... How would that case be distinguished from this one legally? I know that there are factual distinctions. Well, I do also want to point out that to the extent that parents are themselves understood to have constitutional rights to raise their children and to make determinations about their children's well-being, and the Supreme Court precedent on this has been quite clear that this is a right that's particular to parents. It doesn't belong to DSS. Simply because DSS is acting in loco parentis doesn't mean they have the same rights with respect to raising a child who's in their temporary custody. So I hope that provides some of an answer. But you're saying that in that situation, the... I just want to be sure I understand. The state doctors would be liable under 1983 even if parents consented? They could. If parents consented in this exact, otherwise factually similar situation? Well, and I hope this also answers Judge Diaz's question perhaps a little better. I think under the factual circumstances alleged in our complaint, it may be problematic because there is, first of all, we've alleged the total destruction of male fertility. That female fertility was in certainty at best. We've also alleged that this, given MC's condition and his age, that this was an extremely risky surgery. And in fact, we've shown that the doctors were aware that this was a risky surgery. Dr. Aronson, for example, having published a journal article in 2001 in which he recognized that performing a feminizing genitoplasty on a child who later identified himself as male would be, quote, catastrophic. There's also documentation that we've alleged in the complaint that the doctors recognized that there was no compelling reason in this case. Okay, I take all that. And you have all of that in my hypothetical. The only difference is that the parents, the birth parents, are consenting to it rather than the state. The birth parents who have custody of the child, and you think there'd still be a 1983 action. The 1983 action and liability would be identical. Not, I think so, Your Honor, that it could be, that there could be. And one of the reasons, well, first of all, I would point to two cases cited in our brief, which are not from this circuit, but that point to this happening with parents who consented to their children's sterilization and were later actually sued in that capacity. The late case cited in the brief is one example of that. They recovered? I'm sorry. No, please. It was a 1983 action and somebody recovered against? I don't know if they eventually recovered, but the court did sustain the 1983 claims and found that the parents were essentially acting in concert with state actors who sterilized the child. In this case, it was. But we're not talking, we're talking about your procedure that's at issue here, a procedure identical. Not a forced, not a forced sterilization, quasi-sterilization. I understand that this lesson makes it less likely that there will be procreative rights, but we're talking exactly this procedure. And you have some case? Well, yes, I would cite to the Bellotti case and the Danforth case cited in our briefs, which explain that parents don't enjoy complete veto power over children's reproductive capacity and decision making. Okay, I'm done. This will be my last question. I'm asking if you have a case that involves the procedure that is at issue here. No. 1983. No. Okay. Any case. You don't have any case. 1983, none. Involving a sex assignment surgery? Yes. No, Your Honor. So what is the difference between your state law claims and your substantive due process claims? Well, the substantive due process claims obviously are premised on the 14th Amendment claims to privacy, to the right to make decisions about reproduction. Right. The state law claims involve whether informed consent was obtained. I understand that. But what is the, in law, what is the difference? I mean, the Supreme Court has told us repeatedly that there's a difference between any tort claim and a constitutional claim based on the same fact. There's always a difference. And I'm asking if you can identify for me what the difference is here. Well, the difference is that in our 14th Amendment claim, we are discussing fundamental rights that exist for children, for individuals under the Constitution of the United States. I mean, the same, Your Honor, I... To reproduce. To make decisions about reproduction, yes. And also to bodily integrity. So, I guess... So you could never do this surgery from your perspective? You'd have to wait until the child was 18? No. Okay, what am I missing? Well, I think that one thing we haven't talked about yet is the importance of a hearing. Well, but see, okay, so now you're talking procedural due process. That's correct. And I'm really struggling with that. Now, I will tell you... If I were DSS, or DSS lawyer, or one of these doctors, or the lawyer for one of these doctors, I wouldn't go anywhere near this child without talking to a lawyer. And I don't know what happened here. And frankly, for all this talk about clearly established law, there's a part of me that says, what were they thinking? Why would anybody who works for DSS in 2006, or any doctor for that matter, not go to some judge somewhere and say, hey judge, what do you think about this? Now, that's just me. Hindsight's always 20-20. But that's not how the law lays this out. So, what would happen in a procedural due process hearing? So the judge would have to appoint a guardian ad litem separate from DSS. Correct. Afford the money to hire additional physicians, right? Perhaps. And psychologists, and bioethicists, and neurologists, and have... Really, I'm not diminishing your claim at all. I'm just trying to think this through. So I'm the judge sitting there, and I've got these doctors over here, these doctors over here, these psychiatrists over here, tons of medical literature, lawyers all over the place, and I'm supposed to decide whether to permit DSS to perform the surgery before the child is 7, or 8, or 9, or 10, or 11, or 12? I mean, have I spun it out? Certainly. And I think that the procedure you're discussing is actually the procedures that are used by courts around the country to decide, and these are indeed, I think, decreasing in frequency, but to decide whether a person who is not competent to consent can be sterilized. Those very procedures... But this is not sterilization. Do you allege that sterilization was inevitable here? We do not allege that it was inevitable. Okay, so this is not a sterilization case. That's correct. Okay. But it significantly impacted MC's right to make decisions about reproduction, and that under the Supreme Court precedent is enough to clearly establish that significant infringement on the right to make decisions about reproduction is a violation of his 14th Amendment rights. So, again, focused on procedural. We're back on substantive. So the judge chooses what? The expert she likes best? Not to be too flip about it, but how does a judge make a medical judgment in this context? Well, to the extent that this is a medically unnecessary surgery, that would be something that would have to be weighed by the judge. Why is there a compelling interest in doing this surgery? Because in order to significantly... When you say to the extent this is medically unnecessary, that is the medical decision to be made, and you think that that decision for a minor, at least a very young minor, has to be made by a judge. Yes, Your Honor. Even where the parent, I think you were suggesting in response to Judge Motz, even if the parent wants the surgery done. If destruction of fertility is implicated, yes. So what if the judge had said this is all right? Then you wouldn't have a procedural due process. We would not have a procedural. Does your substantive due process claim go away? No, Your Honor. We don't think that under the... Whoa. Well, we have pled... Maybe I'm not... If the judge approved it, you'd still have a substantive due process claim? Under these circumstances, we believe we would, Your Honor, because we're talking about... What if it were affirmed on appeal? Well, it wasn't, Your Honor. Yeah, but no, we've got to try to find the light at the end of this tunnel. At least I do. Right. So you could sue Justice Scalia? Or if he dissented? You couldn't? I mean, come on, really? No, I... Judicial approval of a medical procedure on a minor could give rise to a substantive due process claim against the surgeon or the... That boggles my mind. Your Honor, I concede that it might be very useful for them to raise in their defense that a judge had signed off on this procedure. That didn't happen here. And we allege that there are certain circumstances under which the state cannot make these kinds of decisions for a child. And this is one of them. I wanted to address Dr. Amrine's arguments regarding causation here. I see I have very little time left. I think the Avery case is very important in regards to the causation piece of this. Because in Avery, the court understood there and held that state actors could be held liable for causing or essentially participating in causing the sterilization of a minor, even without taking direct action toward that minor. The defendants in the Avery case were the County Board of Social Services and the County Board of Health. So that certainly suggests, and I believe in the Avery case there's even language about there not being a requirement that there be a direct... That those who are held liable not necessarily have been directly involved in the surgery or the sterilization itself. Rather, if their policies and practices gave rise, basically constituted deliberate indifference to the minor's right to make decisions about reproduction that they could be held liable. It's also important to note here that DSS contends that it relied on the recommendations of multiple doctors. Presumably Dr. Amrine is one of those doctors. And we also allege that he participated in the treatment team that carried out essentially the surgery. Maybe you can just tell me, because they took a lot of time, extra time, so I'll give you a little bit of extra time here. In response to this question, what put all of the defendants, or any of them, on notice that what they were doing violated clearly established law? We would cite Eisenstadt v. Baird, Casey, Your Honor, Belotti. And you know about all of the teachings from the Supreme Court about that it has to be a particular and not a general. So I guess I'm looking for the most specific thing that actually put them on notice that this procedure, that doing what they did here violated the established law. I think that likely the language of Eisenstadt v. Baird as modified by Danforth with respect to minors. And I would also point to the important bodily integrity holding of Winston, Your Honor, in that regard. I see my time has expired, so we'd like to just in closing ask that this court affirm the district court's denial of defendants' motions to dismiss. Thank you. I think what is clear from the arguments here today is that, Your Honors, there are a lot of questions, and the law doesn't have answers for these questions. And obviously if the judges of this court are struggling with the issues, the lawyers involved in this case are struggling with these issues, I think that's pretty indicative that the law in this area is not clearly established. I do want on the first prong of the qualified immunity analysis, and I do want to briefly address the second prong. I know there's not a lot of time. But we still haven't heard the right being defined in its most particular circumstances. Now, the amicus suggested, and I know Justice Diaz just mentioned, is there a right to be free from medically unnecessary surgery? The problem with defining the right in that way is it encompasses, it brings in the concept of medically unnecessary, it brings in the concept of standard of care, it brings in the concept of tort, medical malpractice. There is a medical malpractice action that's pending against these doctors and against DSS and state court. This court, the United States Supreme Court, has specifically said you can't use 1983 to pursue a tort claim. Just because medical malpractice may be committed by a state doctor or state actors doesn't make it a 1983 violation, doesn't make it a violation of substantive due process. That's clear from cases this court deals with all the time, and that's pretrial detainees, medical care issues for pretrial detainees. Falls under the substantive due process clause, just like what's at play here in that particular case. Without question, when there's a difference of opinion as to the course of treatment, and that's what we have here, if you define the right as what has been submitted that this is medically unnecessary surgery, well, obviously that brings into play the standard of care, that brings into play a challenge to the course of treatment. If there's a challenge to the course of treatment, that's an issue for tort law. That's an issue for a medical malpractice state law claim. It doesn't give rise to a substantive due process claim. Well, but your adversary says, well, it's a little bit more specific than that. It's the right to be allowed to procreate, and that was denied. She says substantially denied her client in this case. Well, there are plenty of medical, I'm no medical doctor, but there are plenty of medical treatments that can have the effect of sterilization. Is that to suggest that any time anybody undergoes chemotherapy, which can sterilize a person, I believe I'm correct on the medicine on that, you have to go before a judge or a doctor who orders chemotherapy can be then later sued for a violation of a right to procreate? I don't think the law goes that far. I'm going to ask you a very provocative question. Sure. You've been here all morning. You know that's how I roll. If this issue came up next week in another family, would you advise your clients to go to a court in North Carolina? Your Honor, and I hate to go outside the record, there is some. Obviously, the family court was tied up in this whole situation. The case was before the family court from the very, very beginning. There were issues. Obviously, the family court was well aware of the medical condition of this child. But didn't sign off on it. As I understand it, and again, I know that's not in the actual complaint. As I understand it, the court said if the guardian, DSS, the biological mother who still had parental rights, and the doctors all agreed to a course of action. You don't have a court order to that effect? Well, certainly not in this record. I'd have to go back to look and see how it's spelled out in the family court. Well, you don't know whether you have such an order in your file back in Raleigh. I don't think it's specified to that nature, but I think that was the way it was decided at a hearing. But again, we're bound by the pleadings in this particular matter. If I could have 30 seconds just to discuss the second prong, Your Honor, and I know we've got a lot of lawyers splitting time here. You know, I think, and obviously the easy way for this court, I think, to rule in this case and avoid these very difficult issues, these unsettled issues on the first prong, is look, is there any clearly established law in this circuit? There isn't. All you have to look at is what they're relying on. They're relying on the Cox case from 1975, and what's unbelievable about the Cox case, it was a statute of limitations case. There's one sentence in that decision. How do you distinguish Avery? How do I distinguish Avery? Avery also never decided the actual issue. It was before this court on a motion for summary judgment. It predated Harlow. It predated qualified immunity. I don't think this is your strongest argument. This court did not look at whether or not those facts gave rise to liability for any of the providers. The medical providers actually weren't even part of the appeal. There was a social worker trainee who all she had done, according to the decision, and I've gone back to try to find any future orders or decision in this particular case. It doesn't exist, at least as far as I can tell. That's kind of why I asked you what I call the provocative question, whether you would go to a judge next week. Because obviously when we think of clearly established law, we think of decisions by courts. Some circuits say you can look outside the circuit. I think our circuit is more jealous of its prerogative. So if we agree with you in this case, then the law still won't be clearly established. That's your position, right? Well, certainly the court could decide it on the first prong, but you certainly don't need to. I think without question there's no clearly established law in this circuit. And if we agree with you on that, then the day after our opinion comes out, there would still be no clearly established law. That would be your position. And, Your Honor, quite clearly, to the extent that this all boils down to a standard of care, whether it's medically necessary or not, that's a standard of care question. Counsel has already conceded that the standard of care is in dispute. I don't know how that means. Assuming that's the duty, that's clearly not established. But that will be decided in state court in a medical malpractice case, which is pending. The court's going to have to then determine what the standard of care is. So ultimately that issue might very well get fleshed out in the companion case that's pending right now in state court in South Carolina. But as far as ruling on the first prong, the constitutional right, this court can reach that issue. Under Pearson, you don't have to reach that issue anymore. Thank you very much. May it please the Court, very briefly, Your Honor, the MPLEs have conceded that this case is not a sterilization case and that there's no case about this particular surgery that they could cite to. Those concessions establish that under the second prong of the qualified immunity analysis, our clients are entitled to qualified immunity because there was no clearly established law in 2006 or now when they provided this therapy. In addition, Your Honors, the state law case could establish the law in South Carolina at least and there wouldn't be qualified immunity going forward after the state law case is litigated because those issues could be fleshed out on how you would go about the procedure in our state at least. And then our doctors would be bound by that. Your Honors, if we take the MPLEs position to its logical end, then state actors could never provide medical care to minors. That could end up causing any... I have to say, I haven't gotten much help from you all, is that there's no limitation on your end either. According to you, as soon as the person who has custody of the child consents, you can do whatever. No, Your Honor, I don't think that's true. One of your colleagues seemed to suggest that to me. I think that there are cases that say what you cannot do. And I didn't look at every single medical case involving consent. Name me some of these things you cannot do. I'm sorry, excuse me, Your Honor. I think that the cases on the forced sterilization, we know that you can't do that. And those were for reasons that were very different from here. In this case, this was a therapeutic procedure that was done with concern to a clinically diagnosed problem. This was not to stop imbeciles or any other maybe... You talked about forced sterilization. Is there anything else you can't do? That would provide a... That would take you outside of the realm of qualified immunity? I don't think so, unless there is a case that would put the doctors on notice that what they were doing... But see, that can't be true, because then you get into the cases that the other side is stating, what the Supreme Court has said is a general matter. There have to be some area of the law that the doctors just reading those cases are on fair notice. They cannot do. And that the state people that have custody of the child would also be on fair notice. And what I've been trying to tease out is, how do we find out what those are? What do we look to? And you seem to say you have to have an exact case on point. And that's not right either. That's not right. It's not an exact case. It is a case that would put a reasonable physician on notice that would reasonably set up some parameters for the physicians. Again, appellees can see that this is not a sterilization case and that there is no case about this surgery. But there is no case. There is no substantive law in South Carolina. There is nothing that the appellees can point to that would have let the MUSC doctors know that they were transgressing a bright line. And, Your Honor, respectfully, this may be a point that separates the defendants. Because, you know, sometimes the state agency is addressed and the physicians are not. And I'm not saying that that is or is not true. But as far as the physician's conduct being looked at and being reported upon and having an opinion or some clearly established law, it's not there. I think it might be closer to there for maybe some other parties, but not for the physicians who were providing this therapy with the consent of the custodial representative. Thank you very much.
judges: Diana Gribbon Motz, Albert Diaz, Andre M. Davis